UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| JEREMY JONES | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | No. 3:04-CV-137-S |
| | ) | |
| LIBERTY MUTUAL FIRE | ) | |
| INSURANCE COMPANY | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**MOTION TO COMPEL**

The Plaintiff, Jeremy Jones, by counsel, submits this motion to compel the Defendant, Liberty Mutual Insurance Company, ("Liberty") to respond to Plaintiff's Second Set of Requests for Production of Documents. Liberty's response to the Second Set of Requests for Production of Documents is attached as Exhibit A. Of the twenty requests propounded upon Liberty Mutual, it has deigned to respond only to three, and those responses are woefully inadequate.[1] The remaining seventeen requests are objected to based upon overbreadth, relevance, undue burden, vagueness, uncertainty as to the terminology used in the request, that the requests seek proprietary information, this Court's February 20, 2008 Order, and *State Farm Mut. Auto. Ins. Co. v. Campbell*. These

---

[1] Liberty's response to Request No. 30 is the 2006 version of its Variable Incentive Plan. The document produced plainly indicates that it is replacing at least one prior version. As has been recognized by this Court's sister court, the development of Liberty's claims handling policies is an evolving process, with prior procedures and policies forming the foundation of new modifications. *Republic Svcs., Inc. V. Liberty Mut. Ins. Cos.*, 2006 WL 1635655, 4 (E.D.Ky.)(Slip Copy). Liberty's response to Request No. 38 is a copy of its 2004 version of the Bodily Injury Claims Investigation Handbook. The response fails to include prior or subsequent versions and fails to include copies of documents referenced in the Appendices. Finally, in response to Request No. 46 for training materials, Liberty provided only a list of the titles of training seminars attended by Scott Nunley and Dick Fowler.

objections are without merit, and Plaintiff now moves the Court to order Liberty to fully and completely respond.

In the mid-1990s, Liberty Mutual, along with several other large insurance companies, contracted with the consulting firm McKinsey & Company to review their corporate practices with an eye towards increasing profits. McKinsey determined that the best way to increase profits for these insurers was to cut costs associated with paying insured's claims, including reducing the amounts paid on the claims. While there is nothing improper about attempting to increase profits, insurers are prohibited from turning their claims-handling units into profit centers. Following McKinsey's recommendations, Liberty Mutual and a few other major insurers redesigned their claims handling processes in order to shift focus away from policyholders and artificially lower claims payouts. Rather than affirmatively attempting to learn the extent of its policyholder's injuries, these practices turn the policyholder into an opponent by making the process adversarial.

The corporate documents generated to effectuate the re-design cloak its purpose and effect in benign language designed to conceal the fact that it is improperly pitting itself against its policyholders. Liberty uses terms and phrases like "identifying areas of opportunity" and "reducing leakage" as substitutes for denying claims or offering less than full value. It implemented the new policies using practices like "closed file review" and "claims process review" to train adjustors on how to resist full payment on certain claims. It also utilized a computer program called the Claims Outcome Advisor (COA) to produce settlement values based upon pre-set injury codes. Recent testimony by J. Robert Hunter, Director of Insurance, Consumer Federation of America, before the senate judiciary committee succinctly sums up the problem with such programs:

> For instance, many insurers are using programs such as "Colossus,"
> sold by Computer Sciences Corporation (CSC.) CSC sales literature

> touted Colossus as 'the most powerful cost savings tool" and also suggested that the program will immediately reduce the size of bodily injury claims by up to 20 percent. As reported in a recent book, "…any insurer who buys a license to use Colossus is able to calibrate the amount of 'savings' it wants Colossus to generate…If Colossus does not generate sufficient 'savings' to meet the insurer's needs or goals, the insurer simply goes back and 'adjusts' the benchmark values until Colossus produces the desired results." . . . Programs like Colossus are designed to systematically underpay policyholders without adequately examining the validity of each individual claim. The use of these programs severs the promise of good faith that insurers owe to their policyholders. [2] [3]

Liberty's plan worked, as demonstrated by Exhibit B, showing 61% of loss payouts to bodily injury claims in 1990 reduced to 50% in 2003.

Documents showing the purpose and effect of the redesign have been the subject of lawsuits across the country, and recently received substantial media attention after Allstate defied court orders to disclose the documents. Allstate was withholding documents related to what it called Claims Process Redesign. Liberty Mutual's version for auto insurance is called the Bodily Injury Initiative. Interestingly, Allstate has publicly disavowed the practices implemented by McKinsey while Liberty has affirmatively acknowledged its use continued.

Although Liberty is refusing to produce many of the documents related to bodily injury and UIM claims handling policies, similar documents related to its workers compensation unit have been made public. Attached as Exhibit C is a slide used in training workers' compensation claims

---

[2] http://www.consumersunion.org/pub/Antitrust%20Senate%20McCarran%20Repeal%20Testimony%202007%20(2).pdf. (Internal citations omitted).

[3] Computer Sciences Corporation is currently involved in litigation with the creators of Liberty's COA system claiming they misappropriated CSC's trade secrets related to its Colossus product and used the trade secrets in the development of COA. *Computer Sciences, et al v. Policy Mgmt. Systems, et al*, Case No. 1:00-cv-00033-SS (W.D. Tex.)

adjusters that was admitted as an exhibit in the case of Houle v. Liberty Mutual.[4] The slide is entitled "Measures of Success" and lists "Lower losses" among the measures of a successful adjuster. Attached as Exhibit E is another exhibit from the Houle trial, designed by McKinsey and entitled "Workers' Compensation Process Review: Identifying Areas of Opportunity." This document is focused entirely on reducing "leakage" (claims Liberty could have avoided or settled for a reduced amount) in its claims payouts. Exhibit F is entitled "Benchmarking Workers' Compensation Claims Processing Costs" and was also prepared by McKinsey. Although Liberty's current responses claim ignorance to the term "benchmarking," this lengthy document uses the term regularly to compare Liberty's bottom-line with that of other insurers. The document is replete with references to Liberty's desire to become the "lowest cost carrier" by reducing the amount or value of claims it pays. These documents show the implementation of a system focused almost exclusively on reducing claims payouts for workers' compensation. At the same time these policies were being implemented in workers' compensation, the Bodily Injury Initiative was implemented for auto adjusters.

The Requests related to policy and procedures ought not be in dispute. These requests are paraphrased from requests *approved* by Kentucky's Supreme Court in *Grange Mutual Insurance Company v. Trude*.[5] The relevancy of such documents is readily apparent. To begin with, these documents provide a roadmap identifying and describing the pathway that Jeremy Jones's claim traveled within Liberty. The policies and procedures documents requested are relevant in establishing that (1) the denial of Jones's claim was virtually preordained and intentional; (2) the

---

[4] The trial exhibit list is attached as Exhibit D.

[5] 151 S.W.3d 803 (2005).

denial was in keeping with Liberty's general business practices; and (3) the denial was not an instance of misjudgment, mistake, or error, but rather the denial was handled as Liberty handles all of its other bodily injury claims. This information is also directly relevant to Plaintiff's claim for punitive damages because it shows the motive, intent, and profitability of Liberty's conduct.[6]

Consistent with this Court's February, 2008 Order, Plaintiff's requests are aimed at obtaining information relating to these nationally implemented policies and procedures for handling bodily injury and underinsured motorist claims. Jones has the burden of showing that Liberty's claims handling processes were designed to encourage or reward hardball claims handling. These national policies directly affected the handling of Plaintiff's claim, and any claim that the discovery is limited by *State Farm Mut. Ins. Co. v. Campbell*[7] is misplaced. This type of discovery is regularly permitted based on the recognition that to establish a bad faith claim, "a review of the policies and procedures of the companies in order to determine whether those policies instructed claims handlers to act in bad faith or provided them with an incentive structure that led to bad faith actions is necessary."[8] In *McSwain v. Allstate Indemnity Co.*,[9] Allstate made objections that are virtually identical to Liberty's in this case. In rejecting Allstate's reliance on *Campbell*, that court correctly noted that "the cited case sets standards for the imposition of punitive damages; its says nothing about the

---

[6] KRS 411.186.

[7] 538 U.S. 408 (2003).

[8] *Saldi v. Paul Revere Life Ins. Co.,* 224 F.R.D. 169, 177 (E.D.Pa. 2004).

[9] 2007 WL 1656238 (S.D. Ohio)

discovery of facts which may or may not constitute a basis for a punitive damages award."[10] These very arguments were also roundly rejected by a district court in Michigan mere months ago.[11]

Plaintiff also requested documents concerning Liberty's "Variable Incentive Plan" ("VIP") and incentive-based-pay plans, including performance measurements to obtain corporate goals, savings, targets, etc. The Kentucky Supreme Court recently had the opportunity to consider whether incentive pay programs may be discovered in insurance cases, and answered that question in the affirmative:

> Wilder claims that the compensation of Grange's employees could be keyed to obtaining low settlement, which in turn might encourage bad faith practices by adjusters and other employees. Wage, salary and bonus data as to the employees described in the discovery requests shed light on this subject, as would the discovery requests as to how Grange's overall compensation system works. Thus, insofar as the requested personnel records relate to compensation of the employees involved and the other records relate to how Grange's overall compensation system works, they are discoverable.[12]

The VIP program evidences the institutional motivation to deny claims and reduce payouts. These financial incentives destroy the objectivity of the people making the decisions whether to pay a claim. Rather than being objective, the decision makers have a financial interest in denying the claim or making unreasonably low settlement offers. Under such circumstances, it is virtually impossible that a fair, complete, objective decision can be made concerning claims and rescissions.

---

[10] *Id.* (Citation omitted).

[11] See *Doan v. Allstate Ins. Co.*, 2008 WL 2223123 (E.D. Mich.) (Slip copy).

[12] *Id.* at 815; *see also Farmland Mutual Ins. Co. v. Johnston*, 36 S.W.3d 368, 376 (Ky. 2000).

Liberty has built bias into its systems and procedures that financially benefit Liberty to a policyholder's detriment.[13]

                                            Respectfully submitted,

                                            /s/   *Theodore W. Walton*
                                            CARL D. FREDERICK
                                            THEODORE W. WALTON
                                            SEILLER WATERMAN LLC
                                            22nd Floor-Meidinger Tower
                                            462 S. 4th Street
                                            Louisville, KY 40202
                                            Telephone: (502) 584-7400
                                            Facsimile: (502) 583-2100
                                            E-mail: cfrederick@derbycitylaw.com
                                            E-mail: walton@derbycitylaw.com
                                            Attorneys for Plaintiff

---

[13] The undersigned recognizes that this memorandum exceeds the number of pages originally anticipated, but believes that the Court would benefit from a full, if slightly longer, explanation of his position. Should the Court deem further argument necessary, Plaintiff would not oppose a hearing on the matter.

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2008, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

>W. Douglas Kemper, Esq.
>dkemper@fbtlaw.com
>
>Donald L. Miller, II, Esq.
>dmiller@fbtlaw.com

I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the following non-CM/ECF participants:

>[none]

>/s/   *Theodore W. Walton*
>THEODORE W. WALTON

G:\doc\LEL\Jeremy Jones MCD outline.wpd